CHAMPION COATED PAPER CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19279. Promulgated February 1, 1928.

434

*B. G. Simpich, Esq.*, for the petitioner.
*Philip M. Clark, Esq.*, for the respondent.

OPINION.

Trussell: Petitioner charges three errors on the part of the respondent in determining deficiencies in its income and profits tax for the fiscal years ending April 30, 1919, 1920, and 1921 in that—

(a) The rates used to compute depreciation were too low;

(b) Its depreciation reserve as of January 1, 1917, was arbitrarily increased in the amount of $92,945.81; and

(c) It was not allowed as a deduction for the fiscal year 1919, a conservancy district assessment in the amount of $129,600, paid by it in that year.

In respect to the first error charged, petitioner insists that the operation of its plant in the three years in question was under abnormal conditions in that the war had deprived it of many of its competent machine operators and mechanics, whose places could be filled only with inexperienced men, who could not get full production from the machines except by overloading the capacity of the equipment, and who were ignorant of the manner of caring for and keeping the machinery in repair. Petitioner claims that this condition caused the machinery and equipment to depreciate at an abnormal rate which was also aggravated by the fact that the press of war orders made it impossible to slack up operations sufficiently to make needed repairs.

Petitioner further alleges that during the years in question it sustained a very material loss in obsolescence of buildings and equipment and that this loss, together with the abnormal wear and tear referred to, justified rates of depreciation for those years of 15 per cent on machinery and equipment, 6 per cent on buildings, and 20 per cent on office furniture and fixtures.

Practically all of the testimony presented at the hearing was upon this question of excessive wear and tear and obsolescence of various machines, buildings and facilities of petitioner. This testimony shows a condition during the three taxable years in question which would, it is thought, result in more than normal depreciation on machinery and equipment, but it fails in several material respects to show obsolescence which can be determined even approximately in amount or as sustained over that period.

Petitioner's machinery and equipment was installed at various times beginning with the year 1901. The dates of acquisition are given in respect to only a few isolated items and in some of these cases with considerable uncertainty. The record shows that many pieces of machinery and equipment were discarded in the general overhauling and that nearly all of these had a remaining usefulness but were taken out because of obsoleteness as not meeting the present requirements in a plant of this character. In not one instance is the original or depreciated cost of these items of machinery or equipment given but some of it is shown to have been in use for many years, individual items being among those installed in 1901.

The record shows that the discarding and replacement of this machinery and equipment began in the year 1921 and continued for

five years. The last of the three fiscal years under consideration ended on April 30, 1921, and consequently few, if any, of these assets were actually discarded during the period before us for consideration, and a large part of them were unquestionably in use by petitioner for several years subsequent to that period. During the fiscal years 1919, 1920, and 1921 all of the equipment in question was in continuous use by petitioner, operating 24 hours a day for 6 days a week and producing the maximum tonnage for which the plant was constructed and equipped. Under this proof the conclusion is unavoidable that even though the progressive loss in value of these assets from obsolescence began during the period in question, the major portion of it was subsequent thereto, and we are unable to determine any amount for obsolescence upon specific items of machinery, the original and depreciated cost of which is not shown. *Wallis Tractor Co.*, 3 B. T. A. 981; *Yough Brewing Co.*, 4 B. T. A. 612.

Petitioner insists the rates of depreciation of 6 per cent on buildings, 15 per cent on machinery, and 20 per cent on office furniture and fixtures are reasonable for the taxable years in question. The record shows that no depreciation was taken from 1900 to 1912, although the plant was in continuous operation. Beginning in 1912, petitioner set up a reserve for depreciation by using a general composite rate of 5 per cent which, with the exception of the year 1913, during which no depreciation was charged, was maintained up to and including the fiscal year 1917. For the fiscal years 1919 and 1920, petitioner used the varying rates of depreciation on different classes of assets as found by us and computation shows these to be equivalent to composite rates of 6.08 per cent on buildings and 12.34 per cent on machinery and equipment, or a general composite rate on all depreciable assets of 9.8 per cent. For the fiscal year 1921, petitioner charged depreciation to this reserve at somewhat lower rates, as found by us, and equivalent to composite rates of 4.01 per cent on buildings and 7 per cent on machinery, or a general composite rate on all depreciable assets of 5.09 per cent. For the fiscal year 1922, petitioner charged depreciation at still lower rates and equivalent to 2.9 per cent on buildings and 4.58 per cent on machinery or a general composite rate of 4.01 per cent.

In arriving at a determination of petitioner's tax liability for the fiscal years in question, respondent adjusted depreciation by using rates of 3 per cent on buildings, 7 per cent on machinery, 10 per cent on office furniture and fixtures and 25 per cent on automobiles. These rates, applied to the fiscal years 1919, 1920, and 1921, are equivalent to general composite rates of 5.38 per cent, 5.43 per cent and 5.56 per cent, respectively, on all depreciable assets.

Petitioner, in its appeal, asks that not only the rates used by respondent for the taxable years in question be discarded, but that it be allowed depreciation at higher rates than those actually used by it in making its tax returns for such years. The rates requested are 6 per cent on buildings, 15 per cent on machinery, and 20 per cent on furniture and fixtures, and by computation these are shown to be equivalent to general composite rates of 11.37 per cent for 1919; 11.46 per cent for 1920, and 11.7 per cent for 1921. The changes in these depreciation rates and those requested are as follows:

*Equivalent of composite rates for depreciation*

|  | As charged by petitioner | As allowed by respondent | As now asked by petitioner |
|---|---|---|---|
|  | *Per cent* | *Per cent* | *Per cent* |
| 1919 | 9.80 | 5.38 | 11.37 |
| 1920 | 9.80 | 5.43 | 11.46 |
| 1921 | 5.90 | 5.56 | 11.70 |
| 1922 | 4.01 | | |

It will thus be seen that petitioner after charging depreciation to its reserve in prior years at a general composite rate of 5 per cent, on reaching the years 1919 and 1920 had practically doubled that rate and in the year 1921, dropped back to a rate slightly in excess of the one first charged, and in 1922 reduced the rate to one even lower than the original rate.

A considerable amount of testimony was introduced at the hearing on the question of the depreciation of machinery in a plant of the character of petitioner's. Practically all of this testimony was general in character. It was shown that the processes of manufacture were such that deterioration of machinery resulted not only from the wear and tear of strain, vibration and friction, but also from the action of certain chemicals which came in contact with the walls, flooring and machinery in their vicinity. This condition existed in what was known as the " wet end " of the paper machines. It was also shown that during the period under consideration the wear and tear on machinery from all causes was increased by reason of the inefficient force procurable for the work and the strain of running the plant at maximum speed over and above normal conditions of operation.

To determine a reasonable rate of depreciation for the period in question, we must be sufficiently informed of the effect of normal and abnormal operation on the life of the buildings and machinery. On this question the proof is very meager indeed. The testimony shows that certain parts of certain machines and of certain buildings had a life under ordinary operation of one, three or five years, but in

almost no case is the value given of the individual part as compared to the whole. We can not determine the useful life of the buildings and machinery in normal or abnormal use from the testimony as to how often some isolated particular part, whose cost is not shown, had to be renewed, and especially where it appears that some of these renewals were treated as regular expense items.

In only one instance is the relative value of a part renewed indicated by the record, this being in respect to the buildings, the testimony showing the life of roofs on some of these to be from three to five years. On this point it is shown that the combined cost of roofs and concrete floors averages 10 per cent of the total cost of the building, the excavation and foundations being the main cost and these having a life of very many years.

We can not escape the conclusion from the testimony that deterioration of petitioner's buildings and machinery under normal operation was not rapid. It is shown that paper mill buildings of this character are very substantially constructed, much of the machinery being placed below the ground level and the foundations being very heavy. The record does not indicate any material deterioration of the buildings outside of floors and roofs. The rebuilding cost subsequent to 1920 on these buildings was in a large measure to effect structural changes in design to give better ventilation and not to correct deficiencies due to wear and tear. The buildings had been in use for 20 years or more and were still in use at the time of the hearing. The abnormal operation testified to as carried on in the taxable years before us was of the character to cause additional wear and tear to the machinery, but it is difficult to see how a permanent building housing such machinery would be subject to abnormal depreciation from that cause, and the record does not show nor indicate such a result.

In respect to the machinery, the testimony shows various individual parts as renewed from time to time, some of these being treated as ordinary expenses and others capitalized, but, to determine the depreciation upon the machinery and equipment as a whole, such evidence is of little value in the absence of testimony as to the relative value of the particular machines and parts. The only testimony as to the relative value of machinery is in connection with Fourdrinier paper machines, which petitioner's mill superintendent states cost almost as much as the other machines combined. Of these machines there are nine, five having been installed in 1901 and four in 1907 or 1908. These machines, the testimony discloses, were not worn out and discarded, but have been in constant use ever since installed and were still in use at the time of the hearing. It is shown that such machines have bearings and parts replaced at intervals but at least some of these were charged as ordinary expense items on the books.

This testimony does not support the charge of rapid deterioration, but quite the contrary, and in this connection it is noted that these machines are in the " wet end " of the plant where it is testified that deterioration is most rapid.

The machinery in the plant discarded subsequent to 1920 is shown to have had a considerable remaining life of usefulness. The office furniture and fixtures, on which respondent has allowed depreciation for the years involved at the rate of 10 per cent and on which petitioner asks a rate of 20 per cent, included items acquired when the corporation was originally organized. A considerable portion of it was shown to have been in use since 1913. Petitioner replaced all of this property in 1925, and that discarded at that time included articles which have been in use for twenty-five years and a good part of it for twelve years, and when discarded it still had some remaining useful life.

The case of *Fort Orange Paper Co.*, 1 B. T. A. 1230, in which we allowed rates of depreciation in the amounts asked in the present case by petitioner, presented a different condition to that shown in the case now before us. In that case the taxpayer's plant had not been in continuous operation prior to the years for which abnormal depreciation was charged, and the proof showed that the abnormal operation in the taxable years involved so deteriorated plant and machinery as to require it to be remodeled or rebuilt. In the present case expense of remodeling and reconstruction was not due to the strain of abnormal operation of the years 1919, 1920, and 1921 but to constant and normal operation over a long period of years prior to that time, the record showing that the deterioration, and necessity for general overhauling and repair of the plant and machinery, was known and recognized by the officers of petitioner as early as the year 1917.

It is noted that for the fiscal year 1922, during which the plant was operating at maximum capacity, petitioner determined this depreciation on buildings and machinery to be at rates considerably below those allowed by respondent for the fiscal years involved, and at this date the work of reconstruction had only been in progress a short time.

After careful consideration of the testimony we are of the opinion that rates for depreciation of 3 per cent on buildings and 10 per cent on office furniture and fixtures for the fiscal years 1919, 1920, and 1921 are proper.

As to depreciation on machinery and equipment, we have no definite evidence as to the life of such assets from normal use but a general composite rate of 5 per cent has been used on all assets for some years during normal operation by petitioner and has been

accepted by respondent in determining its tax liability for such years. On the cost ratio of petitioner's "buildings and equipment" to "machinery and equipment," and allocating 3 per cent to the first named class of assets, this is equivalent to a rate of approximately 6 per cent as used on "machinery and equipment" during years of normal operation. Considering all the facts, we are of the opinion that a rate of 8 per cent for depreciation of petitioner's machinery and equipment during the fiscal years 1919, 1920, and 1921 is proper and allows for the added depreciation due to abnormal operation during that period.

Petitioner charges that respondent arbitrarily and improperly increased its reserve for depreciation as of January 1, 1917, by the sum of $92,945.81 on account of depreciation alleged to have been sustained from 1909 to 1913. Respondent in his answer admits increasing the reserve but denies that such action was improper. The only evidence in the record as to depreciation during the period from 1909 to 1913 is that showing that none was taken by petitioner except for the one year of 1912. No facts are proven indicating that the action of the respondent was improper, and consequently the presumption of its correctness is sustained. *Bessemer Investment Co.*, 8 B. T. A. 1011.

In the year 1914, the State of Ohio by public act, 104 Ohio Laws, section 6828, provided a method for voluntary organizing of certain areas into conservancy districts by petition of the freeholders thereof filed in the local court of common pleas, and for the administration of such districts by boards of directors appointed by the court, and to whom are given by the act, authority to determine and carry out plans for (a) preventing floods; (b) regulating stream channels by widening and deepening the same; (c) reclaiming or filling wet and flooded lands; (d) providing for irrigation; (e) regulating the flow of streams; (f) diverting in part or in whole any particular water courses.

The conservancy district thus organized is given the right of eminent domain and the board of directors is authorized to determine by appraisal the benefits to real property within the district resulting from the construction to be carried out under the improvement plan adopted, the damages sustained, and the value of property necessary to be taken, and also the benefits and damages accruing to cities, counties, townships and other public corporations, as political entities, and to the State.

Provision is made for the approval by the court of the appraisals made of benefits, and the board of directors is thereupon empowered to levy assessments upon the real property not in excess of the appraised benefits to such property from the carrying out of the

plan. The funds received from such assessments are expended by the district in carrying out the plan and creating the benefits appraised.

Under this act the owner of real estate on which an assessment against benefits has been made as described, may elect to pay the assessment in full or in annual installments over a period of 30 years.

Petitioner's plant lies within the Miami Conservancy District, organized under the act referred to, and in the fiscal year ending April 30, 1919, it paid the sum of $129,600, which represented the amount of an assessment against benefits accruing from the carrying out of that conservancy district's plan. This amount, it insists, represents a tax and is properly to be deducted under section 234 of the Revenue Act of 1918 in arriving at its net taxable income for that fiscal year. The respondent, in determining petitioner's tax liability, capitalized this payment as of the beginning of the fiscal year 1919 and allowed a proportion of this amount as a deduction for each year of the 28 years remaining of the total numbers allowed under the Ohio conservancy act for payment of annual installments, or a deduction of $4,628.57 for each of the fiscal years involved herein, but by amendment to his answer filed in the proceeding before us, now avers that this allowance was in error as no part of this expenditure was subject to deduction in arriving at net income.

In the case of *Miami County* v. *Dayton*, 92 Ohio State 215; 110 N. E. 726; the constitutionality of the Ohio conservancy act was questioned on the ground that the tax levied for construction of the improvements was a general levy. In holding that the tax in question was not a general tax but a special and local assessment the court said:

Courts will not limit themselves to the form and name of things. It is their duty to probe deep enough to get at substance and the essence of the thing by whatever name or brand it may be known. The whole spirit of the law and its provisions in connection with its practical operation unmistakably indicate that the legislature used this word "tax" in its local and special sense. In short as an "assessment."

Section 234 of the Revenue Act of 1918 provides:

(a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

*       *       *       *       *       *       *

(3) Taxes paid or accrued within the taxable year imposed * * * (c) by the authority of any State of Territory or any county, school district, municipality, or other taxing subdivision of any State or Territory, not including those assessed against local benefits of a kind tending to increase the value of the property assessed * * *.

We have held, in *Caldwell Milling Co.*, 3 B. T. A. 1232, that the exception under subparagraph (c) of the section quoted applies to

local or special assessments as a class and the payment in question is accordingly held not to be the subject of a deduction in arriving at net income. Respondent erred in permitting a deduction of a proportionate part of this payment in each year over the period permitted for payment of the assessment. That period is one merely for pay· ment and in no sense is it the limit of the life of the benefits or petitioner's enjoyment of them.

The item of $129,600 represents and was assessed as a benefit to petitioner's real property and its payment is an addition to the cost of such real property. The amount of this payment should be capitalized and allocated to the several parcels and descriptions of petitioner's real property in the proportion that the values of such parcels and descriptions contribute to the total valuation upon which the benefit assessment was levied.

The deficiency should be recomputed in accord with the foregoing findings of fact and opinion.

> *Judgment will be entered upon 15 days' notice, pursuant to Rule 50.*